IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

NORFOLK SOUTHERN RAILWAY COMPANY,

        Plaintiff,

v.                                    CIVIL ACTION NO.   2:12-cv-05183

NATIONAL UNION FIRE INSURANCE
OF PITTSBURGH, PA, et al.,

        Defendants.

**MEMORANDUM OPINION & ORDER**

Pending before the court are Norfolk Southern Railway Company's Motion for Partial Summary Judgment [Docket 71] and Westchester Fire Insurance Company's Cross-Motion for Partial Summary Judgment [Docket 76]. For the reasons stated below, Norfolk Southern Railway Company's motion [Docket 71] is **GRANTED** and Westchester Fire Insurance Company's motion [Docket 76] is **DENIED without prejudice** with respect to Norfolk Southern's bad faith claim and **DENIED** otherwise.

**I. Factual & Procedural Background**

The plaintiff, Norfolk Southern Railway Company ("Norfolk Southern"), filed this lawsuit seeking coverage as an additional insured for damages resulting from a railroad derailment. Norfolk Southern alleges that it is an additional insured under a policy issued by Westchester Fire Insurance Company ("Westchester").

The following facts are undisputed. On July 21, 2009, employees of Norfolk Southern and Cobra Natural Resources, LLC, ("Cobra") were positioning a train under a coal loading facility

(the "loadout") in order to fill rail cars with coal. As the train passed under the loadout, a Cobra employee noticed that Cobra's scanning device was not properly scanning rail cars. Cobra's loadout operator asked that Norfolk Southern pull the train clear of the loadout and then return it so the cars could be rescanned. As the train was backed through the loadout, a rail broke, derailing several cars (the "derailment"). One of the derailed cars struck the loadout's support beams, causing the loadout to collapse.

Several lawsuits were filed against Norfolk Southern for damages sustained during the derailment and loadout collapse. Norfolk Southern contends that it incurred substantial liability as a result of these lawsuits. Norfolk Southern accordingly brought this lawsuit, alleging, among other things, that it should be indemnified under an insurance policy issued by Westchester, policy number G21979727004 (the "Westchester policy").

In its motion for summary judgment, Norfolk Southern contends that the Westchester policy, obtained by Alpha Natural Resources, Inc., ("Alpha") for Cobra, includes Norfolk Southern as an additional insured and covers Norfolk Southern for its liability arising out of the derailment. Conversely, Westchester argues that Norfolk Southern is not an additional insured, and even if Norfolk Southern was an additional insured, the Westchester policy does not cover Norfolk Southern's liability arising out of the derailment.

Westchester also moves for summary judgment on a portion of the allegations that make up Norfolk Southern's bad faith claim. Norfolk Southern alleges in its Amended Complaint that Westchester breached an implied covenant of good faith and fair dealing by, among other things, violating "the public policy prohibition against subrogation against one's own insured and its duty to act in its insured's best interest." (Am. Compl. for Damages and Equitable Relief [Docket 60] ¶ 301). The complaint continues that "[u]pon information and belief, Westchester paid some or all of

Cobra's damages allegedly arising from the Derailment and then sought to recover such payments from its insured Norfolk Southern through the *Cobra* Action [a suit brought by Cobra against Norfolk Southern in the Circuit Court of Mingo County, West Virginia], while at the same time wrongfully denying the existence of that insurance relationship." (*Id.*).

## II. Legal Standard

### A. Summary Judgment

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or unsupported speculation, without more, are insufficient to preclude the granting of a summary judgment motion. *See Felty v. Graves Humphreys Co.*, 818 F.2d 1126,

1128 (4th Cir. 1987); *Ross v. Comm'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *abrogated on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

### *B. Interpretation of Insurance Policies*

As I have previously decided, West Virginia law applies to the insurance policies at issue in this litigation. (*See* Mem. Op. & Order [Docket 56]). In West Virginia, "[d]etermination of the proper coverage of an insurance contract when the facts are not in dispute is a question of law." *Marlin v. Wetzel Cnty. Bd. of Educ.*, 569 S.E.2d 462, 464 (W. Va. 2002). "Language in an insurance policy should be given its plain, ordinary meaning." Syl. Pt. 1, *Mylan Labs., Inc. v. Am. Motorists Ins. Co.*, 700 S.E.2d 518, 520 (W. Va. 2010) (quoting Syl. Pt. 1, *Soliva v. Shand, Morahan & Co., Inc.*, 345 S.E.2d 33, 33 (W. Va. 1986), *overruled on other grounds by Nat'l Mut. Ins. Co. v. McMahon & Sons, Inc.*, 356 S.E.2d 488 (W. Va. 1987)). "Where the provisions of an insurance policy contract are clear and unambiguous they are not subject to judicial construction or interpretation, but full effect will be given to the plain meaning intended." Syl. Pt. 2, *W. Va. Fire & Cas. Co. v. Stanley*, 602 S.E.2d 483, 486 (W. Va. 2004). However, when "the language of an insurance policy provision is reasonably susceptible of two different meanings or is of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning, it is ambiguous." Syl. Pt. 3, *id.* When an insurance provision is ambiguous, "it is construed against the drafter, especially when dealing with exceptions and words of limitation." *Boggs v. Camden-Clark Mem'l Hosp. Corp.*, 693 S.E.2d 53, 58 (W. Va. 2010) (quoting *Payne v. Weston*, 466 S.E.2d 161, 166 (W. Va. 1995).

### III. Analysis

#### *A. Norfolk Southern Is an Additional Insured under the Westchester Policy*

Norfolk Southern and Westchester each move for summary judgment on the issue of whether Norfolk Southern is an additional insured under Westchester's policy.

Cobra, through its parent company, Alpha, obtained the Westchester policy pursuant to a 2008 lease agreement (the "2008 Lease Agreement") between Cobra and Norfolk Southern. Under that agreement, Norfolk Southern leased to Cobra property at Ben Creek Spur to construct the loadout. Further, Cobra agreed to purchase liability insurance. In relevant part, the agreement read:

> Tenant [Cobra] shall procure and maintain, at all times and at its expense, in a form and with an insurance company acceptable to Landlord [Norfolk Southern], Commercial General Liability Insurance for the Premises. Such coverage shall (a) have a single limit of not less than $2,000,000 for each occurrence (or such greater amount over time so as to be commercially reasonable) and shall provide for a deductible of not more than $5,000.00, (b) cover Tenant's contractual liability hereunder, (c) cover Tenant and Landlord for liability arising out of work performed by any third parties for Tenant in or about the Premises, (d) name the Landlord Entities as additional insureds, and (e) be considered primary and noncontributory, regardless of any insurance carried by Landlord.

(2008 Lease Agreement [Docket 76-4] ¶ 21). Norfolk Southern contends that the 2008 Lease Agreement obligated Cobra to maintain general liability insurance that named Norfolk Southern as an additional insured. Cobra obtained a primary insurance policy from National Union Fire Insurance of Pittsburgh, PA ("National Union") with a limit of $2 million and an umbrella policy with a limit of $10 million from Westchester that sat above the National Union policy. (*See* Westchester's Mem. in Supp. of its Cross-Mot. for Partial Summ. J. [Docket 77], at 3).

The issue here is whether Norfolk Southern is an additional insured under the Westchester policy. That policy stated that it covered Alpha and its subsidiaries (Cobra), as well as:

> (a) any person, organization, trustee or estate that has obligated you by written contract to provide the insurance that is afforded by this policy, but only with

5

respect to liability arising out of "Your Work", "Your Product" and to property owned or used by you[.]

(Commercial Umbrella Liability [Docket 71-5], at 20]).

Westchester contends that Norfolk Southern is covered as an additional insured under section (a) by the National Union policy, not the Westchester policy. Westchester points to the lease provision obligating Cobra to obtain insurance coverage with a "limit of not less than $2,000,000." (2008 Lease Agreement [Docket 76-4] ¶ 21). According to Westchester, because Cobra obtained the $2 million coverage from National Union, and Cobra was not obligated to obtain more insurance, Norfolk Southern is not an "organization . . . that has obligated [Cobra] by written contract to provide" the Westchester policy. (Commercial Umbrella Liability [Docket 71-5], at 20]).

I disagree. The 2008 Lease Agreement does not establish a cap on the insurance Cobra is to obtain. Quite simply, Cobra was required to obtain insurance for the benefit of Cobra and Norfolk Southern, and that insurance could not have a limit of "less than $2,000,000." Cobra could, and did, obtain insurance in excess of $2 million consistent with the terms of the 2008 Lease Agreement. Further, the 2008 Lease Agreement expressly contemplates limits greater than $2 million, as indicated by the parenthetical clause, "(or such greater amount over time so as to be commercially reasonable)."

*USX Corporation v. International Insurance Company*, cited by Westchester, is distinguishable because the underlying contract in that case stated that insurance coverage was limited to "up to one million dollars." Civ. No. 94-5534, 1996 WL 131030, at *1 (E.D. Pa. Mar. 21, 1996). Cobra's obligation to obtain insurance is not similarly capped. The other cases cited by Westchester employ Westchester's faulty reasoning that "not less than" is a cap on Cobra's

6

obligation. *See, e.g.*, *Musgrove v. Southland Corp.*, 898 F.2d 1041, 1043-44 (5th Cir. 1990) (applying Louisiana law) (where contractor was obligated to obtain general liability insurance of "not less than $1 million" for itself and the plaintiff, the plaintiff was not an additional insured under the excess liability policy); *Forest Oil Corp. v. Strata Energy, Inc.*, 929 F.2d 1039, 1045 (5th Cir. 1991) (applying Texas law) (where contract obligated operator of oil and gas fields to obtain general liability insurance coverage for the benefit of operator and non-operator "of not less than $100,000" per incident and "not less than $300,000," non-operator was not an additional insured under operator's $1 million excess policy); *Allied Corp. v. Frola*, Civ. No. 87-462, 1992 WL 281114, at *8 (D.N.J. Oct. 6, 1992) (landlord was not an additional insured where contract required lessee to obtain coverage of "not less than $500,000").

For the reasons already stated, I **FIND** that Norfolk Southern qualifies as an additional insured under the Westchester policy. I therefore need not decide whether Westchester is estopped from denying coverage.

### *B. Norfolk Southern's Liability "Arises Out of" Cobra's "Work"*

Having found that Norfolk Southern is an additional insured under the Westchester policy, I must now decide whether the derailment qualifies for coverage under the Westchester policy. The Westchester policy covers additional insureds, "but only with respect to liability arising out of 'Your Work', 'Your Product' and to property owned or used by you." (Commercial Umbrella Liability [Docket 71-5], at 20]). The policy defines "Your Work," in relevant part, as "(1) work or operations performed by you or on your behalf; and (2) materials, parts or equipment furnished in connection with such work or operations." (*See id.* at 24). Cobra is the named insured on the Westchester policy, so "you" refers to Cobra.

Norfolk Southern argues that its liability "arises out of" Cobra's work at the loadout facility, and therefore it is covered for the derailment as an additional insured under the Westchester policy. Conversely, Westchester argues that the phrase "arises out of" connotes a direct causal relationship. (*See* Westchester's Resp. to Norfolk Southern's Mot. for Partial Summ. J. [Docket 75], at 8). Westchester does not expressly say so, but it apparently contends that "arises out of" is equivalent to proximate causation. (*See id.* at 10 ("Whether Cobra's work or premises caused the injuries at issue is traditionally a question of fact . . . .")). Because Cobra did not cause the derailment, Westchester argues that it is not required to indemnify Norfolk Southern for the derailment. (*See id.*).

Coverage for the derailment turns on whether it was an incident "arising out of" "work or operations performed by [Cobra] or on [Cobra's] behalf." According to Couch on Insurance:

> Insurance policies often employ such language as "arising out of" and "resulting from" relative to describing the coverage provided by the policy. These phrases are frequently given a broader and more comprehensive meaning than that encompassed by "proximate cause." The phrases are generally considered to mean "flowing from" or "having its origin in." Accordingly, use of these phrases does not require a direct proximate causal connection but instead merely requires some causal relation or connection. Courts have split on where "arising out of" falls on the causation scheme with some courts finding it equivalent to "but for" causation and others finding it somewhere between "but for" causation and proximate causation. However, if these phrases are used in an exclusionary provision rather than a grant of coverage, these phrases will be interpreted narrowly against the insurer.

7 Couch on Ins. § 101:52 (3d ed. 2013).

The West Virginia Supreme Court of Appeals has not defined "arising out of" in this particular context. However, it has given strong indications that it would interpret the phrase broadly. *See, e.g.*, *Baber v. Fortner ex rel. Poe*, 412 S.E.2d 814, 817 (W. Va. 1991) (noting that "the phrase 'arising out of the ownership, maintenance or use' in automobile insurance policies has

8

been given a broad interpretation"); *Huggins v. Tri-Cnty. Bonding Co.*, 337 S.E.2d 12, 17 (W. Va. 1985) (noting the absence of "any expansive language such as . . . the phrase 'arising out of'").

Other courts are in agreement that "arising out of" indicates a broad meaning such as "originating from," "growing out of," "incident to," or "flowing from." *See, e.g.*, *Capitol Indem. Corp. v. 1405 Assocs., Inc.*, 340 F.3d 547, 550 (8th Cir. 2003) ("[U]nder Missouri insurance law, 'arising out of' has been interpreted to be a very broad, general and comprehensive phrase meaning 'originating from' or 'having its origins in' or 'growing out of' or 'flowing from.'"); *Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 370 (5th Cir. 1998) ("The words [arising out of] are understood to mean 'originating from,' 'having its origin in,' 'growing out of' or 'flowing from.'" (citation and quotations omitted); *Fed. Ins. Co. v. Tri-State Ins. Co.*, 157 F.3d 800, 804 (10th Cir. 1998) ("[T]he general consensus that the phrase 'arising out of' should be given a broad reading such as 'originating from' or 'growing out of' or 'flowing from' or 'done in connection with'—that is, it requires some causal connection to the injuries suffered, but does not require proximate cause in the legal sense."); *Winnacunnet Co-op. Sch. Dist. v. Nat'l Union Fire Ins. Co.*, 84 F.3d 32, 35 (1st Cir. 1996) ("New Hampshire courts have consistently viewed 'arising out of' as a very broad, general and comprehensive term . . . meaning originating from or growing out of or flowing from.") (citation omitted); *St. Paul Fire & Marine Ins. Co. v. Ins. Co. of N. Am.*, 501 F. Supp. 136, 138 (W.D. Va. 1980) ("'Arising out of' are words of much broader significance than 'caused by.' They are ordinarily understood to mean 'originating from,' 'having its origin in,' 'growing out of,' or 'flowing from,' or in short, 'incident to or having connection with' . . . .") (citations omitted); *Maroney v. New York Cent. Mut. Fire Ins. Co.*, 839 N.E.2d 886, 889 (N.Y. 2005) ("[t]he words arising out of have broader significance . . . and are ordinarily understood to mean originating from, incident to, or having connection with . . . .") (quotations omitted).

Both parties argue that *Baber v. Fortner ex rel. Poe* supports their position. In that case, the court interpreted an automobile insurance policy that provided coverage for acts "arising out of the ownership, maintenance or use" of the automobile. 412 S.E.2d 814, 817 (W. Va. 1991). The insured faced a wrongful death lawsuit after he intentionally shot a man through the window of his vehicle. *See id.* at 816. The insured claimed that the shooting arose from the "ownership, maintenance or use" of his vehicle and therefore asked his insurance company to indemnify him. The court stated that "the phrase 'arising out of the ownership, maintenance or use' in automobile insurance policies has been given a broad interpretation." *Id.* at 817. However, the court declined to find that the policy extended to the shooting:

> Fortner's shooting of Walker was not "foreseeably identifiable with the normal use of the vehicle." The shooting did not occur because Fortner drove the truck to visit his wife. The vehicle functioned merely as the situs of a shooting which could easily have occurred elsewhere, given the circumstances. For this reason, we conclude that an intentional shooting which occurs from within the cab of a stationary pickup truck is not an act arising out of the ownership, maintenance, or use of the vehicle.

*Id.* at 819. Contrary to Westchester's contention, the result in *Baber* did not turn solely on the lack of a direct causal relationship. Rather, the court also noted that the shooting was not "foreseeably identifiable with the normal use of the vehicle." *Baber*, 412 S.E.2d at 819.

In this case, a derailment at a railroad coal loadout is foreseeably identifiable with Cobra's work at the loadout. In *Baber*, the use of the truck had nothing to do with the shooting, but Cobra's loadout operations *did* relate to the derailment. The derailment occurred at Cobra's loadout, during Cobra's loadout operations, and on property Cobra leased. At the time of the derailment, Norfolk Southern was repositioning the train at Cobra's request for Cobra to unload coal. Therefore, it is clear that the derailment arose out of Cobra's work, or, at the very least, arose out of operations performed on Cobra's behalf.

Even if I were to find that "arises out of" is reasonably susceptible to Westchester's proposed definition *and* the broad definition espoused by the cases listed above, the phrase would be ambiguous, and it would be construed against Westchester. *See* Syl. Pt. 3, *W. Virginia Fire & Cas. Co. v. Stanley*, 602 S.E.2d 483, 486 (W. Va. 2004) ("Whenever the language of an insurance policy provision is reasonably susceptible of two different meanings . . . it is ambiguous."); *Boggs v. Camden-Clark Mem'l Hosp. Corp.*, 693 S.E.2d 53, 58 (W. Va. 2010) ("[W]here a provision of an insurance policy is ambiguous, it is construed against the drafter . . . .").

Accordingly, I **FIND** that the derailment arose out of Cobra's "work" as defined in the Westchester policy. This result is not inconsistent with my holdings in *Harris v. Norfolk Southern Railway Company*, No. 2:11-cv-497. In that case, I interpreted a different provision of the 2008 Lease Agreement. That provision required Cobra to indemnify Norfolk Southern "from and against all claims, actions or legal proceedings *arising, in whole or in part, from* the conduct of [Cobra's] operations, or the placement of [Cobra's] fixtures . . . within twenty-five feet (25') of [Norfolk Southern's] tracks." *Harris v. Norfolk S. Ry. Corp.*, No. 2:11-cv-497, 2012 WL 6209198, at *5 (S.D. W. Va. Dec. 13, 2012). Interpreting the phrase "arise from," I held that

> the plaintiff's claims do not *arise, in whole in part, from* either the conduct of Tenant's operations or from the placement of Tenant's fixtures, equipment, or other property. . . . The plaintiff's claims *resulted from* the derailment of NSRC's rail cars, which in turn *resulted from* NSRC's alleged failure to maintain and inspect its tracks. Stated differently, the plaintiff's state law negligence claims *arise from* the alleged failure of NSRC to comply with federal regulations setting forth standards of track inspection and maintenance, not *from* the conduct of Cobra's operations or any placement of anything within 25 feet of the tracks.

*Id.* (emphasis added). The term "arising from" means, essentially, "resulting from." *See* Black's Law Dictionary 115 (8th ed. 2004) (defining "arise"); *see also Nutter v. St. Paul Fire & Marine Ins. Co.*, 780 F. Supp. 2d 480, 483 (N.D. W. Va. 2011) (in the insurance context, "[c]ase law has

11

found the terms 'arising from' and 'resulting from' to be synonymous"). Thus, "arising from" has a more narrow definition than "arising out of," and my *Harris* opinion is not controlling here.

Accordingly, Norfolk Southern's motion [Docket 71] with respect to the Westchester policy's coverage is **GRANTED** and Westchester's motion [Docket 76] on the same issue is **DENIED**.

### C. Bad Faith Claim

Westchester also moves for summary judgment on a portion of the allegations that make up Norfolk Southern's bad faith claim.[1] Norfolk Southern alleges in its Amended Complaint that Westchester breached an implied covenant of good faith and fair dealing by, among other things, violating "the public policy prohibition against subrogation against one's own insured and its duty to act in its insured's best interest." (Am. Compl. for Damages and Equitable Relief [Docket 60] ¶ 301). Essentially, Norfolk Southern argues that a sister company of Westchester, Westchester Surplus Lines Insurance Company ("WSLIC"), sued Norfolk Southern through Cobra in violation of the anti-subrogation rule in a prior lawsuit in the Circuit Court of Mingo County, *Cobra v. Norfolk Southern*, Civil Action No. 11-C-354.

In the insurance context, "subrogation" occurs when an insurer stands in the shoes of an insured and "inherits the right to sue" a third-party tortfeasor. 16 Couch on Ins. § 222:5 (3d ed. 2013). But, "[n]o right of subrogation can arise in favor of an insurer against its own insured, since by definition subrogation arises only with respect to rights of the insured against third persons to whom the insurer owes no duty." Syl. Pt. 2, *Richards v. Allstate Ins. Co.*, 455 S.E.2d 803, 804 (W. Va. 1995). There are two main public policy considerations behind this "anti-subrogation" rule.

---

[1] As Westchester acknowledges, its motion addresses only one aspect of Norfolk Southern's bad faith claim. Thus, even if I granted Westchester's motion, it would not result in dismissal of Norfolk Southern's entire bad faith claim; rather, it would only limit the scope of the claim.

First, the rule seeks to prevent insurers from having a conflict of interest that reduces the insurer's incentive to vigorously defend its insured. *See id.* at 805; 16 Couch on Ins. § 224:3 (3d ed. 2013). Second, "the insurer should not be able to pass its loss to its own insured, thus avoiding coverage which its insured has purchased and paid in the form of premiums." *Id*.

Norfolk Southern contends that Westchester, through its parent and sister corporations, violated the anti-subrogation rule: "[WSLIC]'s subrogation action [Cobra's Mingo County lawsuit against Norfolk Southern] combined with Westchester's improper denial of coverage worked in synergy to avoid a net economic loss" to the parent company of WSLIC and Westchester. (Norfolk Southern's Resp. to Westchester's Cross-Mot. for Partial Summ. J. [Docket 84], at 9). Westchester moves for summary judgment on this claim, arguing that a separate, distinct company, WSLIC, brought the subrogation action against Norfolk Southern, and therefore the anti-subrogation rule does not apply.

Norfolk Southern asserts that a genuine dispute of material fact exists "regarding the number and identity of Westchester affiliates involved in the Cobra subrogation action, the extent of their involvement, and on whose behalf they were acting." (Norfolk Southern's Resp. to Westchester's Cross-Mot. for Partial Summ. J. [Docket 84], at 11). After reviewing the briefs and exhibits attached therein, I **FIND** that there is no genuine dispute of material fact at this time. Norfolk Southern cites three separate facts supporting its claim that the Westchester entities improperly acted in violation of the anti-subrogation rule. Each of these facts allegedly shows the involvement of Westchester's parent entities, described variously as "ACE" entities,[2] in the derailment claims adjustment process. First, ACE Westchester Specialty Group directed the

---

[2] The parties' briefs confusingly mention a number of separate ACE entities that are apparently parent companies of both Westchester and WSLIC. These entities include ACE Westchester Specialty Group, ACE USA, and ACE US Holdings, Inc., ACE Limited, and ACE.

13

adjusters working for WSLIC to retain counsel to protect the subrogation interests of Cobra's insurers. Norfolk Southern quotes an email from the adjuster service, York Claims Service, Inc. ("York"), wherein York states that "[a]s directed by ACE Westchester Specialty Group, we have engaged the services of Cozen & O'Connor . . . to protect subrogation interests of the insurers." (Underwriting Report of York [Docket 84-1], at 10). Second, the adjuster file's "'Underwriter Directory' lists a 'Major Claims Manager' for 'Westchester Specialty Group,' not for [WSLIC] specifically," and "[t]he Major Claims Manager's email address is hosted by 'acegroup.com.'" (Norfolk Southern's Resp. to Westchester's Cross-Mot. for Partial Summ. J. [Docket 84], at 11). Finally, ACE USA sent coverage denial letters to Norfolk Southern "on behalf of Westchester Fire Insurance Company." (*See* Coverage Denial Letters [Dockets 71-9 and 71-10]).

None of these facts, if true, tends to show that Westchester *itself* sued Norfolk Southern in contravention of the anti-subrogation rule. At most, they show that the parent company of Westchester and WSLIC involved itself in the derailment adjustment process on some minor level. But the anti-subrogation rule only proscribes subrogation "in favor of an *insurer* against its own *insured*." Syl. Pt. 2, *Ferrell v. Nationwide Mut. Ins. Co.*, 617 S.E.2d 790, 790 (W. Va. 2005) (emphasis added) (quoting Syl. Pt. 2, *Richards v. Allstate Ins. Co.*, 455 S.E.2d 803, 804 (W. Va. 1995)).

In West Virginia, "[t]he law presumes that two separately incorporated businesses are separate entities[.]" Syl. Pt. 3, *S. Elec. Supply Co. v. Raleigh Cnty. Nat. Bank.*, 320 S.E.2d 515, 516 (W. Va. 1984). In some cases, however, "[j]ustice may require that courts look beyond the bare legal relationship of the parties to prevent the corporate form from being used to perpetrate injustice, defeat public convenience or justify wrong." *S. States Co-op., Inc. v. Dailey*, 280 S.E.2d 821, 827 (W. Va. 1981). Even so,

> the corporate form will never be disregarded lightly. The mere showing that one corporation is owned by another or that they share common officers is not a sufficient justification for a court to disregard their separate corporate structure. Nor is mutuality of interest, without the countermingling of funds or property interests, or prejudice to creditors, sufficient. Rather it must be shown that the corporation is so organized and controlled as to be a mere adjunct or instrumentality of the other.

*Id.* (citations omitted). There are no such facts to suggest that WSLIC and Westchester are so organized and controlled by each other as to be mere adjuncts or instrumentalities of one another. *See State v. Schenectady Hardware & Elec. Co., Inc.*, 636 N.Y.S.2d 861, 862-63 (N.Y. App. Div. 1996) (denying summary judgment where "defendant did not meet its initial burden of demonstrating that [the two insurers] are, as a matter of law, so significantly united in interest as to invoke the antisubrogation rule . . . . Defendant failed to demonstrate domination, control and abuse of that control by the parent company over [the two insurers], which are essential elements to pierce the corporate veils so as to impose alter ego liability[.]").

Even though no such facts exist at this time, discovery in this case is ongoing and scheduled to close on April 14, 2014. (*See* Order [Docket 92]). Summary judgment should be granted only after "appropriate time for discovery." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264, 280 (4th Cir. 2013); *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996). Norfolk Southern contends that it has served document requests on Westchester that will "shed light on the relationship between and among the web of entities comprising ACE Limited, including, but not limited to, ACE USA, ACE Westchester Specialty Group, Westchester Fire Insurance Company, and Westchester Surplus Lines Insurance Company." (Norfolk Southern's Resp. to Westchester's Cross-Mot. for Partial Summ. J. [Docket 84], at 13). Norfolk Southern also asserts that it plans to depose various ACE and Westchester

...

employees on this topic. (*See id.*). Therefore, Westchester's motion on Norfolk Southern's bad faith claim is **DENIED without prejudice**. Westchester may renew this motion at the close of discovery.

### IV. Conclusion

For the reasons stated above, Norfolk Southern's motion [Docket 71] is **GRANTED** and Westchester Fire Insurance Company's motion [Docket 76] is **DENIED without prejudice** with respect to Norfolk Southern's bad faith claim and **DENIED** otherwise.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: February 26, 2014

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE